FILED18 JUL '18 1554USDC-ORP

Lisa Hay, OSB # 980628
Federal Public Defender
   Email: lisa_hay@fd.org
Stephen R. Sady, OSB # 810995
Chief Deputy Federal Public Defender
   Email: steve_sady@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ICE DETAINEE # 1<br><br>                          Plaintiff,<br><br>v.<br><br>JOSIAS   SALAZAR,   Warden   FCI Sheridan; and ELIZABETH GODFREY, Acting Field Officer Director, Seattle Field Office, ICE.<br><br><br>_____ Respondents | Case No. 3:18- CV- 1279-MO<br><br>DECLARATION OF CHIEF INVESTIGATOR WILLIAM J. TEESDALE ESQ. IN SUPPORT OF HABEAS PETITION |

I, William J. Teesdale, declare:

1.      I am employed by the Federal Public Defender for the District of Oregon as Chief

Investigator and have held this position since July 2009. Prior to that, I was employed as an

investigator with the Federal Defender's Office, and have been engaged in criminal defense

investigation since 1992. I am a member of the bars of Oregon and England. My current work

involves conducting investigation activities in a range of criminal defense cases, including habeas corpus matters, and supervising the investigation department of the Oregon Federal Public Defender.

2.     On June 11th, 14th, 19th, 21st, 26th, and 27th, staff members of the FPD met with 121 immigration detainees held at FCI Sheridan. I personally attended meetings at Sheridan on June 14th, 21st, 26th, and 27th, and I discussed the meetings that occurred on the other dates with the staff members who attended.   Additional meetings occurred in July. The statements in this declaration are based upon my own personal observations and discussions with those other staff members who attended the Sheridan meetings.

3.     Our office originally learned that new inmates would be arriving at Sheridan when an investigator saw stacks of mattresses being delivered to the FDC on May 31, 2018. His inquiries revealed that 140 new inmates were expected.

4.     On June 1, the interpreter in our office received a call on the dedicated attorney phone line from an immigration detainee at Sheridan.  The detainee reported that he and his wife and child had requested asylum at the Mexican border. They were separated, and he now found himself at Sheridan. He asked for help.  Several other detainees found the FPD phone and called the office during the next week.  They also asked for help.

5.     The Federal Public Defender requested and received appointment on June 8th to respond to the requests for help and to investigate the possible constitutional violations occurring at the FDC through the detention of persons in a federal prison without due process.

6.     When the Defender and an interpreter went to Sheridan to meet with detainee clients on June 11, they were told by staff that the immigration detainees "can't have lawyers." A

lieutenant escorted then out of the visiting room. Eventually, they were allowed back in later that day after their appointment order was reviewed.

7.    During the subsequent meetings with detainees, we heard that the detainees had been transported to FCI Sheridan from various detention centers in California and Arizona. The detainees had received so little information upon arrival that most were unaware that they were in the state of Oregon. Detainees reported that since they arrived, they had been unable to use to the phone, and they were unable to call family overseas to let them know they were safe or to speak with attorneys.

8.    I learned that the detainees came from India, Nepal, Mexico, Guatemala, Honduras, China, Russian, Armenia, Eritrea, Bangladesh, and other countries, and had been detained at or near the U.S./Mexico border. Nearly all of the detainees reported they were seeking asylum in the United States.

9.    At the time of our first several meetings, detainees were housed in pods J1 and J2 at the FDC. I am aware from my work that pods J1 and J2 at the FDC are used to house not only federal pretrial detainees, but also defendants who have been found guilty of federal crimes but not yet sentenced, and defendants who have been convicted of federal crimes and sentenced but are awaiting designation to a federal prison. The immigration detainees were celled in the same units as these federally-charged and convicted defendants.

10.    When we met them, the detainees were dressed in brightly colored prison jumpsuits. In later meetings, the jumpsuits were dirty, some were ripped, and the detainees explained that they had not been given new clothes for five days.

11.    After one of our meetings with detainees, FPD staff watched as they were individually removed from the visiting room to be strip-searched before returning to their housing unit.

12.    During our meetings, FPD employees witnessed the condition of the detainees and obtained statements from the detainees about their incarceration.  Based on my experience, the conditions are equal to or more punitive than those experienced by convicted felons serving sentences.

13.    Generally, the following conditions were observed and reported during meetings in June:

a)    detainees were triple-bunked in cells and confined in the cells for 22 hours per day or more;

b)    they were shackled when transported to the prison;

c)    they were strip searched in front of other detainees;

d)    they were housed in cells that contain an open toilet, causing extreme embarrassment and distress from the lack of privacy and the filth;

e)    they were fed in their cells;

f)    they were fed meals that were of inadequate proportions or nutritional value, or failed to take into consideration religiously-based dietary needs;

g)    they were provided no indoor or outdoor recreational opportunities;

h)    they were prohibited from wearing religious headwear, unable to pray at required times due to confinement, and denied access to religious advisors;

i)    they had no access or very limited access to phones and were cut off from their families and all legal help;

j)    they were not provided instructions or information in a language they could understand;

k)    they did not understand how to access medical care and had unaddressed medical needs;

l)    some detainees had been separated from children or other family members at the border and did not know anything about their well-being;

m)    some detainees cried when meeting with FPD staff and asked for help;

n)    FPD staff observed signs of depression, anxiety, terror, stress and despair among the detainees.

14.    Most of the detainees did not speak English. We spoke with them through an interpreter and through use of a language phone service. Many of the detainees felt they could not use the prison phones or access other prison necessities like towels and toothpaste because they were unable to communicate in English. Some reported being scolded by guards when they did not understand English instructions or commands.

15.    The immigration detainees were triple-bunked in their cells. Moreover, during their first several weeks at Sheridan the men we met with reported being locked in their cells 22 or 23 hours per day. They reported that the cells were cramped, and because they were not given cleaning supplies for the toilet in their cells, they smelled horribly. Many detainees reported feeling intense anxiety and stress due to the cramped conditions.

16.    The detainees told us that they were not receiving enough food. Many reported that they were not receiving adequate vegan or vegetarian food in accordance with their religious dietary restrictions. Some men explained that the lack of vegetarian options meant that they ate one slice of bread and three pieces of cucumber for one meal. Sometimes, detainees received meals in their cells and were forced to eat in the small open space next to the toilet. At other times, detainees were allowed to eat in the mess area, but were only given ten minutes to eat and were unable to finish their meals.

17.    In addition to not having access to enough food because of religious dietary restrictions, several detainees expressed that they had not been allowed access to religious services or religious visits. Detainees mentioned that they had requested a pastor or religious leader visit them to help with their stress and anguish, but had not been allowed a religious visit.

18.     Several of the detainees that we met had untreated medical conditions. Detainees reported heart problems, a gunshot wound, a broken leg, rashes, allergic reactions, and severe sore throats. Detainees reported trying to tell the prison guards about their medical concerns, but being unable to communicate adequately in English. During our meetings in June, the detainees had not received any information in their native languages about how to access medical care at the prison.

19.     I helped collect written statements from many detainees about their circumstances, which were then translated to English. Those statements are filed in support of habeas petitions. Most detainees were unwilling to reveal their true name in a public filing out of fear of persecution or retaliation.  We instructed them that, if the court would not allow them to proceed under an alias, we would move to withdraw their petition.  The following are translated statements from detainees:

-       When they first brought us to the jail we were handcuffed/ shackled both in the hands and legs. Then they brought us via airplane and we were still handcuffed. We had lot of difficulty eating and drinking. We also had lot of difficulty in doing other work and nothing was okay with us. I was not allowed to talk to my wife and we did not even get good food.

-       I have not had any conversation with my wife since I came here. It is over a month that my family is worried about me. It is too bad here. Whenever I ask them that I want to call my family, they would say, you cannot call your family and if told them to call for me they would not call. We were also not allowed to meet any prisoners. We were kept 24 hours under one roof. We do not know anything about our families and about the outside environment. We were not even allowed to carry on with our religious deeds. We could not convey  anybody how and in what conditions we are staying here.

-       Ever since we came her nothing has been going right for us. Here we are stripped regularly. They would check my neck. When we would sit down to eat they would shout to eat quickly, we hardly get 10 minutes to eat food. And whenever we keep some of the food to eat it later at night, they would take that and throw it away. We never get Vegetarian food at all. They would serve us meat, sometime beef and sometime pig meat. We would not

eat that and remain hungry. They would give us food inside and not let us out and remain 22 hours inside. It is a terrible condition here.

- I have a hard time communicating with him [the guard] when it's time to eat, like, when I have to go in or come out. I have a hard time asking him for information about the telephones, or asking him for toiletries like soap, tooth paste, towels. I cannot explain things to him and he cannot understand me. I have 3 other people in my cell. I have to put up with the smell when we use the toilet. I get desperate because I am locked up.

- I was kept inside for 22 hours and was not allowed to wash cloths; we are not able to pray to God inside here as the bathroom was beside where we stayed.

- Criminals live along with us .We were very afraid of them. I had wrapped towel on my head but it was taken off from my head. It is violation against our religion.

- When I reached here I was checked completely naked and never got the right food of my choice and were kept with gangsters inside for 22 hours and because of which we were disturbed, there was no facility for medicine and were not allowed to talk to our families and we don't not get clean clothes to wear here. I used to get disturbed and we asked about all this and the Guard would tell us that they don't know anything about them. We don't know when we would be able to talk to our families, I am disturbed mentally here.

- We used to be kept in the jail for 22 hours which was very difficult to bear. We used to have lot of difficulty in sleeping inside. Repeatedly thinking about this affected us mentally s stating inside a room for 22 hours is very difficult mentally. We were searched naked in front of everybody. We used to get ashamed of each other after this. We were never treated that badly like this ever before and were not able to understand as to why are they are giving us this kind of punishment.

- When we were brought to Oregon jail, we all were 25 persons in the bus, out of which, 2 boys were in difficulty. They had a strong urge to urinate but they weren't allowed to urinate. When we reached the jail, one boy among us was kept in cell with **** people. He used to cry a lot and we were in stress to see his pain. When outside, he used to request to let him out of that room. He used to pray, in front of us, to God to rather kill him. And he also said to send him back to *** otherwise he is going to die in that room. Whatever happened to him was not good.

- It is over 7 days today and we are in the same dress. Our complete day passes in a small room and we are unable to understand why they have kept us here. What are not being told what our process is? On thinking all this we are disturbed mentally. We are treated as prisoners here and kept as prisoners as well. The sardar person with us is not allowed to tie his turban. When we came here we were searched naked in front of everybody. We are disturbed mentally because of all this. We pray that we be taken out of here. We will be very thankful to you for this.

- There were two other people in my room with me but we are facing great difficulty, there is toilet inside the room and they lock us in there and our cloths are there, we are in great difficulty here as we feel we are in dirt and we feel we are in hell, and sometimes they come and search us naked, we can't even get haircuts here, we are in great difficulty.

- We had to face very bad conditions such as being strip searched in front of everyone, treated like criminals without any of our fault. Our condition in our country was not good. We heard that we would be safe in USA but the situation was different. We also don't know what process was going on here. So please evacuate me from this place. I am here in very tight situation.

- We could not see outside, and if we need medicine, we were told that we don't need it, even after having fever for 2 days I was not given any medicine, my body was destroyed, and after some time there was some improvement, we were starved to left out for a longer duration, but the medicine was still not given.

- Ever since the first day, since I came to California till today, I have not received any medicine, I have fever and headache which is acute but nobody takes care here. I had fever there as well but nobody gave me medicine. After I came here I have had fever and headache and pain in my body many times, I asked for medicine but nobody gave me medicine nor told about it. The pain comes and goes but body was not given any medicine.

- I have great difficulty with food and almost dead due to starvation, I crossed the border on 23-05-2018, after that as on 26-05-2018, that much food is given which just bare enough to keep us alive. 1 roti (tortilla) and vegetable with no salt and no spice and 3 for the whole day, first 31 days we were not given even 1 roti which we did not like, after that we had to eat to avoid starvation, but we used to get Beef in FCI and we don't eat that and would sleep hungry, if we tried to save any fruit for the night they would not let us eat that. We'd sleep hungry.

- Two men from *** was put in our cell no. **, they would not be able to talk and nor would they talk, and when we were let out 1-2 hours, they

would cry, I went with the room charge to the officer repeatedly and told them about him, they would not listen at all. The boy staying with me, he went to take warm water, and the officer was locking but the officer angrily turned the warm jug over his hand, the boy cried a lot and suffered in pain and no medicine was given.

- We have gone into depression after remaining in the cell. We have been treated the same from the starting itself. On the first day in the police station we got only a Burrito one time. Our discomfort increased in Sheridan cell. My head started aching while continuously lying down all the time, we would not feel like talking to one another, and lying on the bed the whole day would get nasty ideas and remembering old days we would feel like crying, we are dying day by day inside here.

- We were three people in the room and the bathroom was besides where we stayed which would stink and it was very difficult sitting and sleeping there. We could not even think praying there, as it was too much dirt/filth around and we cannot even wash our clothes.

- They behaved badly with all of us. The boy in the room besides ours went to get some water and they threw the cup. Some People get late while brushing teeth and they didn't get food. Some were mentally disturbed. Some people didn't like the food. They told us that if we didn't eat the food then they will throw us to prison for 23 hours.

- There is me and one more person in my cell. The conditions are very bad because we are here as if we were inmates. They do not have enough clothes for us to change. They only gave us a jumpsuit and the food we get is not good. We have suffered from stomach aches because of that. I have never been locked up and I have been feeling very bad. I have been very sad because I have never been locked up and they only let us out about 7 hours a day.

- Here we have come to save our lives but I think we will die here in jail. Out of 24 hours we were kept inside for 21 hours.

- At the BORDER PATROL we slept on the floor. It was very cold there and nothing to eat. When I reached Sheridan, I was shocked to see circumstances where we were put in cell. Big Criminals were there. We were kept with them. There I was kept in one room for 22 hours and they don't allow us to go outside. There was nothing or very less to eat. I didn't have medicine there. I was severely ill here Nobody allowed us to contact our home and families for 22 days.

- I faced a lot of problems to get medicine in jail. I didn't get medicine here. My ears were paining so, I have been taken to a doctor but I could not understand so, no medicine. Only I know, how I have been that days.

- We do not get enough food. Yesterday, we only got one piece of meat at lunch time and that is not enough and sometimes, the officers come into our cells and they throw our fruit away.

- On 31 May we were taken to FCI SHERIDAN OREGON. When we were on the way by bus we were handcuffed and toe cuffed. Whole night we were hungry in bus. We felt sleepy but we could not sleep for 2-3 hours we roamed around airport SAN DIAGO in bus then we were put in the bus for 2-3 hours but we were hand cuffed. Then we reached Oregon airport then they took us by bus and we were hand cuffed. We were hand cuffed for 24 hours when they took us. Then they took us to FCI SHERIDAN. There nobody was telling us anything. They kept us outside just for 2-3 hours a day. They kept us outside just for 2-3 days for 10-15 days. It burdened our brains. We asked officers to keep us in hall but they said they couldn't do anything. Many things happened that we couldn't understand. There was nothing according to system. It seemed that we are in control of terrorists. It Seem like we were kidnapped.

- We were treated worse than prisoners. Other prisoners abuse us in a language we can't understand. We are scared to complaint because of the fear of retaliation or something worst will happen to us. One person from our group have been thrown in another cell, but we don't know where. We're not sure how he's doing? We don't know, what his family might be going through?

- When we were inside the cell, my brother was not with me, felt like crying the whole day, I felt that their understanding of us is that we are terrorists. This have disturbed me mentally. There were criminals all around us, who would shout at us in a filthy language, and we used to get frightened and other prisoners would get away with their misbehavior with us.

- Why do they bring us here? We haven't done any crime. But they treat us like criminals. We were not happy to leave our country. We thought that in America we will get respect but there the outcome was a different one. We have heard that people living here behaves very badly with Indians. Here they strip us down like criminals and because of that we feel very insulted. We wore dirty and stinky clothes for many days. They didn't give us clean clothes. Because of stinky clothes we are prone to diseases and we get bad food to eat too. They even didn't tell us the reason why we are here in jail? We should know about our cases and should be released from here as soon as possible. We are very sad and got sick.

- Respected Judge sir, we want to ask why we have been brought here? Why were we put with guilty people (criminals/gangsters)? Why we were badly treated like them but we had done nothing wrong. Why we are strip checked like them. Why are we punished like them? We have heard that in this country, people are very helpful and treat others like us very well but the situation seems to me is opposite. We can't even follow our religion here as there is no priest of our religion and there is no clean place to worship. There are some people with us who used to tie cloth on their head (turban) but they are not allowed to do so which is an insult to them. We want to request you to release us from here as soon as possible. We don't feel clean here. And respected Judge sir, we hope that you will definitely help us and we will be very thankful to you.

- We were held in our cells as prisoners. We were very sad. We felt as if we are stuck on an island in sea and we cannot tell and ask anything from anyone. Sometimes I cried but no one listened. We are getting crazy by the way we were kept locked. Sometimes I feel like dying. It felt like everything is over and I should commit suicide. I was very sad. I have lost all hopes getting out of here.

- When we were chained I was shocked that what has happened. We saw criminals in jail and we were astonished that there were criminals of all type in the jail. We lived here in fear all the time.

20.     At least 20 of the detainees are young men between the ages of 18 and 20.  At the FDC, these youth were being or are housed in cells with adult males.

21.     The Federal Public Defender wrote to the warden of the FDC and to ICE on June 15th, June 29th, and July 9th to express concern about the conditions.  Those letters are attached as Exhibits A, B and C.  Neither the warden nor ICE responded to the letters.

22.     The conditions at the FDC have improved since the litigation was filed in the U.S. District Court in Oregon, including *Osorto-Chicas v. Salazar*, No. 18-cv-1102-HZ (D. Or. 2018), and *Innovation Law Lab et al v. Secretary of the Department of Homeland Security*, No.18-cv-01098-SI (D. Or. 2018).  Specifically, the FDC moved most convicted federal criminals out of the unit that housed the detainees on June 22; detainees have been given more time out of their cells;

phones were installed in the housing unit; and the food has started to include vegetarian items. The attached Declaration of Amberly Newman from the *Innovation Law Lab* case describes both the lack of preparation at the FDC and the improvements attempted (Exhibit 4).

23.     Detainees continue to express distress at their indefinite incarceration despite the improvements. I have heard reports that a detainee attempted suicide; that religious headwear is not accommodated; and medical care is inadequate.

24.     I know that the detainees continue to be housed behind barbed wire, sleep in small cells near open toilets, are clothed in federal prison garb, and are subject to rules that allow strip searches, lockdown in cells, and shackling.  Some ICE detainees reportedly have been moved into segregated housing cells.

25.     I have reviewed the Inter-Agency Agreement between ICE and the BOP that was signed on June 6, 2018 but made retroactive effective to May 29, 2018.

26.     According to news reports, the Justice Department and ICE reached an agreement in June, 2018, to make 1,600 federal prison beds available for housing immigration detainees. https://www.reuters.com/article/us-usa-immigration-prisons-exclusive/exclusive-us-sending-1600-immigration-detainees-to-federal-prisons-idUSKCN1J32W1. I do not know if the reported agreement is different from the Inter-Agency Agreement that applies to the Sheridan FCI.

27.     The Inter-Agency Agreement that applies to the Sheridan FCI requires that ICE detainees be subject to the same rules and regulations applied to pretrial detainees at the FDC facility.  For example, it requires that ICE detainees comply with existing FDC inmate telephone regulations, which require use of the Inmate Telephone System. I am aware that the Inmate

Telephone System is recorded, and also that calls from that system are expensive compared to ordinary calls outside the facility.

28.     The Sheridan Agreement restricts outside contact with the detainees ("Requests to interview ICE detainees will be approved solely by ICE"; "FCI staff will not … comment on matters involving ICE detainees.").

29.     The Sheridan Inter-Agency Agreement does not require the FDC to conform to ICE's Performance-Based National Detention Standards (PBND Standards), even though these standards apply to governmental facilities used by ICE through Intergovernmental Service Agreements (IGSAs).[1] The PBND Standards were most recently revised in 2016 and provide that "IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures."  Although not all BOP facilities engaged in temporary detention of immigrants have been required to conform to the PBND Standards, the standards express ICE's determination of the minimal acceptable conditions for civil confinement.

30.     A sample of the PBND Standards that would apply to immigration detainees at regular ICE detention facilities, and that do not appear to be followed at the FDC, include the following:

> **Strip searches**: Unless there is specific and articulable suspicion that contraband has been transferred to a detainee, detainees shall not be subjected to a strip search after a visit by a consular representative, an attorney, a legal assistant working under the supervision of an attorney, or an accredited representative.  PBNDS 2.10.V(D).

---

[1]  The PBND Standards can be found at: https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf

Officers must obtain supervisory approval before conducting strip searches during admission or release. Staff may conduct a strip search during admission and release, only when there is reasonable suspicion that contraband may be concealed on the person. PBNDS 2.1V(B)(4)(b).

All strip searches shall be documented. PBNDS 2.1V(D)(2).

**Medical Care:** Facilities shall provide appropriate interpretation and language services for LEP detainees related to medical and mental health care. Where appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be provided in an emergency medical situation. PBNDS 4.3V(E)

**Religious accommodation**: Special diets shall be provided for detainees whose religious beliefs require adherence to religious dietary laws; and Detainees shall be provided information about religious programs at the facility, including how to contact the chaplain or religious services coordinator, how to request visits or services by other religious services providers, how to request religious diets and how to access religious property and headwear as part of the facility's admission and orientation program in a language or manner the detainee can understand. PBNDS 5.5II(8-9)

Detainees shall have opportunities to engage in practices of their religious faith consistent with safety, security and the orderly operation of the facility. Religious practices to be accommodated are not limited to practices that are compulsory, central or essential to a particular faith tradition, but cover all sincerely held religious beliefs. PBNDS 5.5V(A)

All facilities shall have procedures so that clergy, contractors, volunteers and community groups may provide individual and group assembly religious services and counseling that augment and enhance the religious program. When recruiting citizen volunteers, the chaplain or religious services coordinator and other staff shall be cognizant of the need for representation from all cultural and socioeconomic parts of the community. Each facility shall provide security, including staff escorts, to allow such individuals and groups facility access for sanctioned religious activities. PBNDS 5.5V(E)

**Recreation:** optimal: Detainees in the general population shall have access at least four hours a day, seven days a week to outdoor recreation, weather and scheduling permitted. Daily indoor recreation shall also be available. During inclement weather, detainees shall have access to indoor recreational opportunities with access to natural light. PBNDS 5.4V(A)

**Telephones:** Each facility shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with all applicable state and federal regulations and be based on rates and surcharges comparable to those charged to the general public. Any variations shall reflect actual costs associated with the provision of services in a detention setting. Contracts shall also provide the broadest range of calling options including, but not limited to, international calling, calling cards and collect telephone calls, determined by the facility administrator to be consistent with the requirements of sound detention facility management. PBNDS 5.6V(A)

**Personal Hygiene:** Detainees shall be provided with a reasonably private environment in accordance with safety and security needs. Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement. Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing. PBNDS 4.5V(E)

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct to the best of my knowledge and belief and that this declaration was executed on

this *18th* day of July, in Portland, Oregon.

William J. Teesdale, Esq.

# EXHIBIT 1

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

LISA C. HAY
  Federal Public Defender
STEPHEN R. SADY
  Chief Deputy Defender
Bryan E. Lessley*
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Susan Russell
Francesca Freccero
C. Renée Manes
Nell Brown
Kristina Hellman
Fidel Cassino-DuCloux
Alison M. Clark
Brian Butler+

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

Branch Offices:

859 Willamette Street
Suite 200
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

Thomas E. Price
Michelle Sweet
Mark Ahlemeyer
Susan Wilk
Oliver W. Loewy
Elizabeth G. Daily
Conor Huseby
Robert Hamilton
Jessica Snyderт
Lisa Maт

*In memoriam*
Nancy Bergeson
1951 - 2009

\* Eugene Office
+ Medford Office
т Research/Writing Attorney

June 15, 2018

By Email

Josias Salazar
Warden
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378-5000

      Re:    *Immigration Detainees at the Federal Detention Center*

Dear Warden Salazar:

      I am writing to bring to your attention the deeply troubling conditions in which immigration detainees are being held in the federal detention center in Sheridan, Oregon, with the hope that emergency steps can be taken to address these conditions. This office has been appointed to provide initial assessments regarding potential legal action to remedy unlawfully punitive custody in which the detainees have been held since arrival. We hope to work collaboratively with you to address these issues but, if we are unable to remedy the situation administratively, we will take appropriate legal action.

      From our interviews with detainees, I can tell you that they are suffering. I have personally met with 49 detainees and my office has responded to calls from more than 20 others. The consistent and significant concerns raised by detainees fall into four categories.

      **1.**     **Length of time confined in cells**. Detainees report that they are triple-bunked in small cells and are locked up for 22 or 23 hours per day. Breaks from the cell may be limited to

Josias Salazar, Warden
FCI Sheridan
June 15, 2018
Page 2

10 minute periods on some days. Most have no reading material in their language. They are beginning to suffer severe psychological distress from their confinement in cramped quarters. I heard reports of panic attacks, breathing problems, headaches, stress and depression. Detainees I met with were visibly suffering from the severe confinement. The psychological distress of not knowing where they are or how long they will be detained is severely exacerbated by the confinement in close quarters.

      **2.**     **Inadequate Food**. I received reports that the meals provided are small portions and of poor nutritional quality. We have been receiving calls that people are hungry. The large number of detainees with religiously based dietary restrictions poses a special problem, as eggs and meat provide most of the protein in the offered meals but are not eaten by many. I heard reports that some detainees, for example, ate only three slices of cucumber and a piece of bread for a meal. Detainees have asked that eggs not be added to their food but are uncertain if this request has been honored.

      **3.**     **Lack of Medical Care**. Possibly as a result of language barriers, detainees feel they cannot access medical care. Several have reported having infections that are not being treated. One is having heart palpitations. Others are concerned they will be infected by the contagious mite that has infected some cells.

      **4.**     **Isolation from Family and Community**. Many detainees are suffering from isolation from their families or networks of support. Phone calls are expensive or unavailable. The detainees have been unable to tell their families they are alive, or to check on the status of family members from whom they were separated. Because the detainees have not been given time for social visits, they are unable to receive support from the religious and cultural communities here in Oregon who are willing to meet with them.

      I know you agree that the detainees have a right to be treated with dignity and in a setting that meets the required standards for both BOP and immigration custody. The isolation, confinement, poor nutrition, and lack of medical care fail to meet this standard. I urge you to act promptly to make changes to end the unacceptable conditions. I offer these thoughts for your consideration:

      •     The Sheridan FDC is simply not equipped to handle immigration detainees along with the pretrial federal population currently housed there. The law requires that these populations be kept separate, but due to lack of space and the configuration of the pods in the facility, your primary mechanism for meeting this separation requirement is constant lock-down of both sides. Continued confinement to this degree will violate the constitution, for both populations. Consider whether immigration detainees could be housed elsewhere, such as at the Northwest

Josias Salazar, Warden
FCI Sheridan
June 15, 2018
Page 3

> Regional Re-entry Center. This facility is approved by the Bureau of Prisons for service of federal sentences and should meet the needs of immigration detention. Approximately 30 beds are currently available at the NWRRC. Consider whether immigration detainees could be released from the NWRRC on electronic monitoring to allow bed space for the next group.

- If the Sheridan FDC is to be used for immigration detention, then consideration should be given to placing immigration detainees together in one full pod – either J1 or J2 – with no pretrial detainees among them. Access to the full pod would allow free movement during the day in the common areas, as well as more access to the yard. This would end the need for lock-down in cells, and if more phones were installed, would give longer access time to the phones.

- If the Sheridan FDC is to be used for immigration detention, consider use of the Federal Prison Camp at Sheridan for outside recreational time. Larger meeting areas at the Camp could also be used for community visiting time. Cultural and religious groups should be invited to bring meal to share with the detainees.

- Resolving the inadequate food and lack of medical attention likely requires an increase in staff and budgets for the FDC. I understand that there has been a hiring freeze in place and that Sheridan was short-staffed even before this new population arrived. I encourage you to bring staff and funding shortages to the attention of Attorney General Sessions in order to allow you to manage your facility as the law and Constitution require.

- If the Sheridan FDC is to be used for immigration detention, all staff should have access to interpreters by telephone. Staff indicated they use demonstrations and hand signals to explain institutional requirements, but detainees have expressed confusion over basic tasks such as use of the phone, purchase of items at commissary, and request for medical attention.

Although you and I have not had the opportunity to meet since your arrival at Sheridan, our offices have a long history of both litigating and working cooperatively to promote justice and to ensure that constitutional rights are protected for detainees at the FDC. I am certain that the sudden arrival of 123 immigration detainees has stressed institutional systems and that all your staff are working hard to make needed adjustments. The reality is, however, that two weeks have now passed and the FDC has not been able to adapt sufficiently to accommodate these new, differently situated residents. I am deeply concerned that, institutionally, it is not possible for your organization to adapt to such a different population while also maintaining programs and care for pretrial detainees.

Josias Salazar, Warden
FCI Sheridan
June 15, 2018
Page 4


       I hope you will be willing to meet this week to discuss these concerns and to seek solutions. In preparation for a meeting, I request a copy of the contract under which ICE has arranged to house its immigration detainees in the federal prison system in Oregon. Any effort to effectuate a policy of deterring asylum-seekers through use of punitive conditions of confinement would raise serious constitutional concerns.   And in my view, confinement under the conditions described by the detainees already violates our law and our values as a country.

       I look forward to hearing from you.


                     Sincerely,

                     Lisa Hay
                     Federal Public Defender


LCH:jll

cc:  Michael Mosman, Chief Judge, U.S. District Court
      Russel Burger, U.S. Marshal

# EXHIBIT 2

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

**LISA C. HAY**
   Federal Public Defender
**STEPHEN R. SADY**
   Chief Deputy Defender
Bryan E. Lessley*
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Susan Russell
Francesca Freccero
C. Renée Manes
Nell Brown
Kristina Hellman
Fidel Cassino-DuCloux
Alison M. Clark
Brian Butler+

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

Branch Offices:

859 Willamette Street
Suite 200
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

Thomas E. Price
Michelle Sweet
Mark Ahlemeyer
Susan Wilk
Oliver W. Loewy
Elizabeth G. Daily
Conor Huseby
Robert Hamilton
Jessica Snyderɩ
Lisa Maɩ

*In memoriam*
Nancy Bergeson
1951 - 2009

* Eugene Office
+ Medford Office
ɩ Research/Writing Attorney

June 29, 2018

By Email

**CONFIDENTIAL**

Acting Warden Israel Jacquez
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378-5000

Elizabeth Godfrey
Acting Field Office Director, ICE
12500 Tukwila International Blvd,
Seattle, WA 98168

Re:     *Urgent Need For Medical Care For Immigration Detainees*

Dear Warden Jacquez and Ms. Godfrey,

I am writing to alert you to urgent medical needs of immigration detainees at the Sheridan FDC. As the government made clear in court yesterday in the temporary restraining order litigation, **I do not have and will not be given access to the doctors at Sheridan. I am therefore including a confidential attachment with patient medical information and request that this be provided to your medical personnel and be treated as confidential.** The medical issues range from untreated gunshot wounds to possible epilepsy to a broken finger to a possible brain infection and are urgent. At a recent meeting, Warden Jacquez referred to gunshot wounds that were at least five years old.   The circumstance described to me involves more recent wounds that are causing pain.

Other detainees have told us they have not received requested medical treatment for sore

Israel Jacquez, Acting Warden
Elizabeth Godfrey, ICE
June 29, 2018
Page 2

throats, fevers, and infections, or have not understood the treatment.   For example, the treatment for scabies was not explained and created unease and distress at forced medication.   My impression is that you need more medical staff to assist with this population of immigration detainees, who have medical issues distinct from your ordinary inmates.

I am away from the office but responding to emails, and could be part of a call if arranged by email. Steve Sady and Jess Snyder in my office can also reach me immediately.

Sincerely,

Lisa Hay
Federal Public Defender

Enc: Confidential medical information

cc:   Steve Sady. Chief Deputy FPD
      Sean Price, FDC Sheridan (w/o enc.)
      Corey Heaton, ICE (w/o enc.)

# EXHIBIT 3

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

**LISA C. HAY**
  Federal Public Defender
**STEPHEN R. SADY**
  Chief Deputy Defender
Bryan E. Lessley*
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Susan Russell
Francesca Freccero
C. Renée Manes
Nell Brown
Kristina Hellman
Fidel Cassino-DuCloux
Alison M. Clark
Brian Butler+

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

Branch Offices:

859 Willamette Street
Suite 200
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

Thomas E. Price
Michelle Sweet
Mark Ahlemeyer
Susan Wilk
Oliver W. Loewy
Elizabeth G. Daily
Conor Huseby
Robert Hamilton
Jessica Snyder★
Lisa Ma★

*In memoriam*
Nancy Bergeson
1951 - 2009

* Eugene Office
+ Medford Office
★ Research/Writing Attorney

## BY EMAIL AND FIRST CLASS MAIL

July 9, 2018

Warden Josias Salazar
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378-5000

Elizabeth Godfrey
Acting Field Office Director, ICE
12500 Tukwila International Blvd.
Seattle, WA 98168

Re:    *Punitive Conditions of Confinement of Immigration Detainees*

Dear Warden Salazar and Ms. Godfrey:

I have previously written to you and to Acting Warden Jacquez with concerns over the conditions under which immigration detainees are being held at the Sheridan Federal Detention Center in Oregon (letters of June 15 and June 29). I appreciate that some changes have been made in the manner of confinement. Nevertheless, the conditions continue to fall below the minimum standards set by our government for immigration detention and, in my view, violate the Constitution by imposing punitive detention on civil detainees. As I expressed earlier, use of a penal detention facility for both criminal incarceration and civil detention creates difficulties that do not appear surmountable. I urge you to reconsider whether immigration detainees can be lawfully held at the FDC at all. In the meantime, I ask that you address the following concerns without delay.

**Failure to Follow Standards for Immigration Detention**

In 2016, ICE revised the Performance-Based National Detention Standards (PBND Standards) that apply to a broad range of facilities that house ICE detainees, including Contract Detention Facilities (CDFs) and governmental facilities used by ICE Enforcement and Removal Operations (ERO) through Intergovernmental Service Agreements (IGSAs). The current ICE detention standards provide that "IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures." Although not all BOP facilities will fall under the defined range of facilities governed by the PBND

Josias Salazar, Warden
Elizabeth Godfrey, Acting Field Office Director, ICE
July 9, 2018
Page 2

Standards, the Standards express ICE's clear determination of the minimal acceptable conditions of confinement. In 2016, when the PBND Standards were updated, less than one percent of all ICE detainees were housed in facilities operated by BOP. Because a large population of ICE detainees are being housed in BOP facilities, the PBND Standards or a suitable alternative should apply. Based on our current investigation, FDC Sheridan has failed to follow the PBND Standards or adopt adequate alternatives. We outline some of these areas of failure below.

**Mental Health Care**

Descriptions of a recent apparent suicide attempt by a detainee have reached our office. Both those who witnessed the incident and those who heard of it have expressed great distress. Under the PBND Standards, the FDC was required to conduct a mental health evaluation of each detainee within 12 hours of arrival; is required to ensure that staff have training to assess potential suicide risks within this immigrant population; should not isolate or subject to disciplinary action anyone attempting suicide; and must offer psychological counseling to those who have attempted suicide or who may have been affected by a suicide attempt. Reports we receive from detainees cause us to question whether these procedures have been followed. We ask that you provide immediate attention to suicide prevention and counselling for those who are experiencing trauma from witnessing the attempted suicide.

**Medical**

PBND Standards require access to medical care and meaningful consultation for non-English speakers. As described to you in my previous two letters, we have concerns that too many detainees are unsure of the way in which medical assistance is to be requested. We are also hearing that medical treatment providers are not using telephonic interpreting, which is required both for effective diagnoses and treatment and for the privacy requirements in a federal facility. The use of other detainees to translate for medical purposes violates express Bureau of Prisons privacy policies. *See* Program Statement 6031.04 at 23 ("Staff will provide inmates the opportunity to discuss their medical complaints without other inmates being present."). We have been sending specific requests for medical assistance for individuals with urgent medical needs, but we ask that steps be taken to ensure that all detainees know the procedures for access to medical treatment and that, when consultation occurs, the medical staff and patient can communicate privately with professional interpretation in the detainees' native language.

**Religious Services and Practices**

The detainees practice many faiths, and many have expressed concern regarding the lack of services and pastoral guidance. The PBND Standards call for custodians to contract with volunteers and community groups to provide religious services to faith groups that the facility itself cannot personally deliver. The need for pastoral care is especially urgent given the individual

Josias Salazar, Warden
Elizabeth Godfrey, Acting Field Office Director, ICE
July 9, 2018
Page 3

and combined effect of the hardships and fear connected to leaving home, the difficulties and stress of the journey, the punitive conditions suffered during detention, and the traumas of the recent incidents at Sheridan. We are aware that Christian and Sikh communities have made efforts to provide support to the detainee population, but have not be able to gain access. If the visiting room facilities at the FDC are not adequate to accommodate visits for both criminal detainees and immigration detainees, the FDC should acknowledge this structural impediment and act to end the punitive detention and find less restrictive means of supervision in the community.

Of special concern is the lack of accommodation of religious headwear. We understand that the turbans that Sikh detainees consider a mandatory part of their religious practice and expression have not been made available. Section 5.5 of the PBND Standards outlines examples of acceptable religious headwear, which includes turbans worn by Sikhs. Although "facilities may restrict the color, size, or other features of religious headwear, as necessary to maintain the safety, security, and orderly operation of the facility," if such restrictions are in place, "the facility must ensure that detainees are provided conforming religious headwear for free or at de minimus cost." This issue should be addressed as soon as practicable either by returning religious headwear seized at the time custody commenced or by providing express and understandable instructions regarding alternative headwear.

**Food**

From the time of arrival at Sheridan, many of the Indian immigration detainees' religiously-based dietary restrictions have not been accommodated. More recently, a "non-flesh" diet has been provided that is reported by some to be of insufficient portion size and nutritional quality as well as culturally unfamiliar. None of the ethnic groups represented at the facility appear to be receiving even occasional culturally familiar fare. According to the PBND Standards, "All facilities shall provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practice, within the constraints of budget limitations and the security and orderly running of the facility, by offering a common fare menu." Additionally, current ICE standards mandate that "[c]are must be taken to ensure that culturally diverse meals are provided in such portions as to be nutritionally adequate." Moreover, "ICE anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility."

We request that Sheridan FCI comply with the standards for civil immigration detention by providing religiously suitable and "culturally diverse meals" to all detainees. We have offered to provide recipes for Indian vegetarian meals that are nutritious, inexpensive, and adhere to the religiously-based dietary restrictions held by the Indian immigration detainees. We would be glad to provide other resources for other groups to assist in providing appropriate meals to the detainees.

Josias Salazar, Warden
Elizabeth Godfrey, Acting Field Office Director, ICE
July 9, 2018
Page 4

**Duration of Confinement**

Although the time during which detainees are confined to cells appears to have decreased from the 22-23 hours per day that occurred during the first three weeks, we understand that significant confined time in cells continues. In addition, some detainees report that they are outside only one time per week. The PBND Standards provide that "detainees shall have at least four hours a day access, seven days a week, to outdoor recreation, weather and scheduling permitted."

**Programming and Library**

The detainees appear to have little to no reading material or library access in their native languages. They appear to have no opportunities for institutional programming and education, nor do they have adequate access to legal materials. We know organizations are eager to assist the detainees. We would be glad to meet and discuss which types of reading materials are needed with the goal of providing them in an appropriate form for the detainees.

In each of these areas, we hope you will respond rapidly to pressing needs of the detainees. We understand that personnel on the ground at Sheridan had no say in the punitive policy that led to the ICE detainees' presence in your facility. The staff at Sheridan are working hard to address many needs, especially the need for access to immigration counsel. At the same time, the policies that led to the detainees' presence here require sufficient reallocation of resources to ameliorate conditions that themselves are punitive: the costs of constitutional detention must be borne by the custodians rather than, as has occurred to date, being subsidized by the detainees in the form of violation of their statutory and constitutional rights. The costs of telephonic interpretation and the needs for additional staff do not justify sub-standard treatment of detainees. While these difficult issues are addressed at the policy level and in litigation, we urge the custodians to take immediate action to at least temper the hardships the detainees are enduring.

Sincerely,

Lisa Hay
Federal Public Defender

LH:jll
cc:     Sean Price, FDC Sheridan
        Corey Heaton, Immigration and Customs Enforcement

# EXHIBIT 4

## DECLARATION OF AMBERLY NEWMAN

I, Amberly Newman, do hereby declare and state the following:

1.    I am the Executive Assistant employed by the Federal Bureau of Prisons ("BOP") at the Federal Correctional Institution located in Sheridan, Oregon, ("FCI Sheridan").[1] As the Executive Assistant, I am an advisor to the Warden on matters of policy, programs, and operations. I am the Satellite Operations Administrator, and I oversee operations at the Federal Detention Center (FDC) and the Federal Prison Camp (FPC). I am also the Public Information Officer. I make the following factual statements based on my personal knowledge and my review of the official records of FCI Sheridan and the BOP.

2.    I have reviewed the Complaint and Application in Innovation Law Lab, et al. v. Kirstjen Nielsen, et al., in Case No. 3:18-CV-01098. If called as a witness, I could and would competently testify thereto.

3.    On or about May 30, 2018, the executive staff at FCI Sheridan was informed that the BOP would be temporarily housing up to approximately one-hundred thirty (130) detainees in the custody of the Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE") and that those detainees would be housed at the Federal Detention Center ("FDC"). The FDC is comprised of two (2) separate housing units, J1 and J2. These two (2) units share a visiting room, with a larger room to accommodate social visitation, and four (4) smaller rooms to accommodate individual legal visits. FDC continues to house approximately 120 detainees and 19 federal inmates (as a small work cadre) in J1, and 124 federal pre-trial inmates in J2.

---

[1]    FCI Sheridan is comprised of the medium security Federal Correctional Institution, a satellite minimum security Federal Prison Camp (FPC), and a Federal Detention Center (FDC).

1

4.    ICE transferred 124 detainees to the FDC on May 31, 2018.  BOP staff at the FDC had to conduct an initial screening of each of the detainees during which time the BOP determined their name and obtained other identifying information.  BOP staff also conducted intake medical screenings.  The detainees were then assigned to each of the housing units.  There are currently approximately 121 ICE detainees at the FDC.

5.    Initially, detainees and pre-trial inmates were housed in both units, with approximately 60 ICE detainees assigned to J1 and J2, along with approximately 60-80 pre-trial inmates.  Detainees and inmates could not immediately be placed into entirely separate units because numerous BOP inmates were potential "separatees", or, inmates required to be kept separated from each other for safety and security reasons.  As such, the detainees and inmates could not be consolidated into single units right away.  Additionally, we were unsure if there were potential security issues between any of the detainees and the inmate population.  Until BOP could determine potential security issues between the two populations, for safety and security reasons, the detainee and pre-trial inmate populations were not allowed to intermingle on the housing units.

6.    BOP then began the process of reviewing all inmates housed in the FDC to optimize the housing situation.  We determined if any inmates could be placed in the FCI, consistent with their current status and consistent with safety and security considerations.  Thirty-three (33) inmates were identified, and after planning a safe movement, they were transferred from the FDC to the FCI.   All BOP inmates were then reviewed to determine appropriate separation status.  In order to maintain the safety and security of the FDC, staff continued to conduct "shakedowns", or searches of cells for contraband, of the inmate cells.

7.    Once BOP had completed review of the inmates and assessed the safety and security of a proposed move, on Friday, June 22, 2018, the detainee population was placed into J1, with a small inmate population, and the majority of the BOP inmates were placed into J2.  This will eliminate the need to lock down one population while the other is out of their cells, and thereby increase access to calls, etc.

8.      As a result of the limited information the BOP had regarding each of the detainees, the need to conduct and complete appropriate medical screening and the need to complete the other administrative tasks necessary to safely house them at the FDC, the initial visitation process was delayed.  The BOP was aware of the need to allow such visitation however, and implemented procedures for attorneys wishing to visit ICE detainees housed at the FDC.  On June 18, 2018, the FDC began visitation Monday-Friday, 8:30 – 11:30 a.m. for pre-trial/pre-sentence inmates and all non-ICE attorney visitation, and 12:00 – 3:00 p.m. for ICE detainee attorney visitation.  After recent assessment of the safety and security situation at the FDC, the FDC intends to implement, not later than Wednesday, June 27, 2018, legal visitation from 8:30 a.m. – 3:00 p.m., Monday – Friday, for all pre-trial/pre-sentence and ICE detainees, on a first come, first served basis.  Attorneys may also schedule an appointment by sending an email to SHE/Attorney_Notification@bop.gov.  BOP submits all first-time attorney requests for legal visitation with ICE detainees regarding administrative immigration cases to ICE.  ICE reviews the request, then authorizes BOP to schedule the visit.  Attorneys who have not yet been cleared by ICE may experience a delay as ICE completes its review.  All visitation is subject to safety and security considerations, such as maintaining separation of separatee inmates.

9.      Attorneys will need to come to the institution with a valid form of non-expired identification, a valid bar card or other credential showing their active status, and provide the name and either Alien number or Register number of the detainee with whom they wish to visit.  The attorney will also need to provide two standard BOP forms, a Visiting Attorney Statement, and if the attorney is accompanied by a non-attorney, such a translator or paralegal, that individual will need to provide a completed Application to Enter Institution as a Representative.  Both forms are available at https://www.bop.gov/resources/policy_and_forms.jsp under the heading "Frequently used forms".  Finally, as with all other visitors to all BOP institutions, the attorneys will

3

1   need to fill out the "Notification to Visitor" form prior to being admitted to the
2   institution.

3        10.   Starting on Tuesday, June 26, 2018, the FDC anticipates beginning to show
4   a "Know Your Rights" presentation to detainees.

5        11.   Unit J1 has seven (7) phones.  One (1) is a dedicated phone line directly to
6   the Federal Public Defender's Office.  Two (2) are "ICE" phones.  ICE phones
7   automatically connect to 877-235-8297, and provide a myriad of extensions with which
8   detainees can choose to connect, including to consulates, crisis hotlines, and others.  The
9   FDC "ICE" phone connections list is attached here as Attachment A.  There are four (4)
10  additional phones on which inmates can make social calls.  (Access codes, or PAC#'s,
11  were assigned to detainees shortly after arrival at the FDC.)  Detainees have access to
12  these phones throughout the day.  Phones are available Monday – Friday from 6 a.m. to
13  9 p.m., with only brief interruption.  Phones are disabled Monday – Friday from 8:30 –
14  9:00 a.m., 12:30 – 1:00 p.m., and 3:00 – 4:00 p.m. to accommodate detainee/inmate
15  counts.  Phones are available Saturday – Sunday from 6 a.m. to 9 p.m. without
16  interruption.

17       12.   In addition to access to phones as noted above, detainees requesting to make
18  a legal call can request such a call though the Unit Team.  The detainee must provide the
19  name and phone number of the attorney whom they wish to call, and the Unit Team
20  member can assist in setting up the call.  Attorneys who wish to schedule a legal call can
21  submit that request to the SHE/Attorney_Notification@bop.gov email address and
22  request one.  The Unit Team will then work to schedule the call.

23       13.   Laptops have not previously been authorized for use at the FDC.  However,
24  the Warden has now authorized limited, conditional use of laptops and tablets as outlined
25  in the "Agreement" at Attachment B, for the sole purpose of a legal visit.  Such
26  conditions and limitations include, but are not limited to: no non-legal or entertainment
27  use; disabling of all wireless communication features and no internet access; and no
28  audio, video, or still photo recordings.  Any attorney wishing to bring in a laptop or

4

1 | tablet will be required to sign the Agreement at Attachment B.  FDC Sheridan anticipates
2 | implementing this procedure not later than Monday, July 9, 2018, in order to train staff
3 | on this new procedure.

4 |

5 |        I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing
6 |        is true and correct.
7 |            Executed this 23th day of June, 2018, at Sheridan, Oregon.
8 |
9 |                                                Amberly Newman

10 |

5