**Lisa Hay, OSB No. 980628**
**Federal Public Defender**
**Email: lisa_hay@fd.org**
**Stephen R. Sady, OSB No. 81099**
**Chief Deputy Federal Defender**
**Email: steve_sady@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Attorneys for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ICE DETAINEE #1 through 74,** | **Case Nos. 3:18-cv-01279-MO through 3:18-cv-01365-MO** |
| Petitioner, | |
| v. | **MOTION FOR EMERGENCY INTERIM RELIEF IN THE FORM OF AN ORDER REQUIRING RELIGIOUS ACCOMMODATIONS FOR ICE DETAINEES** |
| **JOSIAS SALAZAR,** Warden, FCI Sheridan, | |
| **ELIZABETH GODFREY,** Acting Field Office Director, Seattle Field Office, ICE, | *Expedited Consideration Requested* |
| Respondents. | |

The petitioners, through their attorneys, respectfully move this Court for an order directing

the government to accommodate religious beliefs and practices of ICE detainees forthwith

pursuant to the First Amendment, the Religious Freedom Restoration Act (RFRA), sections

2000cc-2(b) and 2000cc-3 of the Religious Land Use and Institutionalized Persons Act (RLUIPA), and Bureau of Prisons Program Statement 5360.09, *Religious Beliefs and Practices* (December 31, 2004). Specifically, the Court should direct that the custodians, as remedial measures for the prolonged violations of rights to religious accommodations for civil detainees: (1) provide religious headwear to detainees including turbans; (2) provide personal religious items of the types seized at the time detainees entered custody; (3) allow pastoral visits and religious services from clergypersons and representatives of the detainees' faiths; (4) provide access to religious writings in appropriate languages for the detainees' faiths, (5) provide appropriate locations for prayer and religious practices; and (6) provide reasonable and appropriate opportunities to observe their religious dietary practices in a culturally appropriate manner.

The punitive detention of immigrants in FDC Sheridan has betrayed ideals and protections that are basic to American freedom and that motivated many of the detainees to seek asylum in this country. For the first weeks after their arrival on May 31, 2018, the detainees were held virtually incommunicado at FDC Sheridan, out of touch with anyone in the outside world, under onerous conditions of confinement, without compliance with laws requiring religious accommodations. Upon being taken into custody, Sikhs had their turbans and other items essential to their religious practice confiscated. Upon arrival in FDC Sheridan, many detainees were unable to communicate with anyone in authority in their native languages. The custodians failed to advise detainees of what rights they had, how to seek religious accommodations, and what accommodations could be made. Although some punitive conditions have been ameliorated, the inability to fully practice their religions has been very distressful to the detainees. Currently, the detainees are being held without required religious accommodations, including that they are not

being permitted to wear required head coverings, not being given adequate time and space to pray, and not permitted to wear the sacred religious items in accordance with their faith. *See* Supplemental Declaration of William Teesdale.

The First Amendment guarantees that the federal government shall make no law prohibiting the free exercise of religion. U.S. Const. amend. I. "Putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" infringes on the free exercise of religion. *Thomas v. Review Bd. Of the Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). In response to limitations on free exercise of religion in *Employment Division v. Smith*, 494 U.S. 872 (1990), Congress enacted RFRA in 1993 to require the government to establish a compelling interest to justify facially neutral laws that burden exercise of religious practices. 42 U.S.C. § 2000bb(a)(4) and (5). RFRA's central provisions created the norm of not burdening free exercise of religion, with any narrow exception to be established by the government. The new general rule: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general application[.]" 42 U.S.C. § 2000bb-1(a).

The only exception that permitted a substantial burden required that the government demonstrate the burden (1) "is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *see also Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[t]he essence of all that has been said and written on the subject is that only those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion."); *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) ("Only the gravest abuses, endangering paramount interests," may justify the restriction of "the

indispensable democratic freedoms secured by the First Amendment.") (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)).

The term "government" in RFRA includes United States agencies, departments, and person acting under color of law. 42 U.S.C. § 2000bb-2(1). The "religious exercise protected by RFRA "includes any exercise of religion, whether or not compelled by, or central to a system of religious belief." 42 U.S.C. §§ 2000bb-2(4) and 2000cc-5(7). The protections afforded to religious exercise in RFRA must be construed broadly. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014) ("Congress enacted RFRA . . . in order to provide *very broad protection* for religious liberty") (emphasis added). RFRA expressly contemplates judicial relief as sought in the present case: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

The protections for religious exercise were extended to the States in the RLUIPA in 2000. Although generally applicable to state facilities, the RLUIPA also bound the federal government in provisions related to the burden of persuasion, which falls on the government, and rules of construction. 42 U.S.C. 2000cc-5(4)(B) (The term "government" "for the purposes of sections 2000cc-2(b) and 20000cc-3 of this title, includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law."). The rules of construction include that the statute "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

Both ICE and the BOP have fallen far short of the statutory requirements for religious accommodation and their own standards. The Performance-Based National Detention Standards, which ICE revised in 2016, call for pastoral care, services, and accommodation for religious headwear and other items, as stated in the FPD's letter to the custodians of July 9, 2018. CR 3 at 26-27. For religious headwear, the FPD placed the government on explicit notice that Sikh detainees had not received accommodation for the headwear they "consider a mandatory part of their religious practice and expression." *Id*. Within the context of institutional safety, the PBNDS state, "the facility must ensure that detainees are provided conforming religious headwear for free or at de minimum cost." *Id*. Similarly, the BOP program statement on religious headwear expressly authorizes Sikhs "to wear the following religious headwear throughout the institution," which is listed as "turban" and "white." BOP Program Statement 5360.09 at 12-13.

Despite the specific reference and request regarding headwear accommodation, the custodians have failed to provide turbans. The written request for accommodation includes pastoral care, services, and religious items. Firsthand reports from FDC Sheridan as of July 23 and 25, 2018, indicate that religious deprivations continue, as reflected in the Supplemental Declaration of William Teesdale. The only effective manner of assuring compliance with the law in the punitive custody that the detainees are experiencing is for the Court to take direct and immediate action to ameliorate the ongoing violations of religious freedom. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) ("inmates suffer irreparable harm when they are unable to attend religious services"); *Chalk v. United States Dist. Court Cent. Dist. Of Cal.*, 840 F.2d 701, 709 (9th Cir 1988) ("emotional stress,

depression and reduced sense of well-being" constitute irreparable injury). The custodians have already failed to adequately accommodate exercise of religious beliefs and practices for far too long.

In formulating an equitable response to violations that are ongoing, the Court should fully implement the concerns for speed, flexibility, and fairness that underlie the writ. *See McQuiggin v. Perkins*, 133 S.Ct. 1924, 1934 (2013) ("equitable principles have traditionally governed the substantive law of habeas corpus"); *Boumediene v. Bush*, 553 U.S. 723, 780 (2008) (Habeas "is, at its core, an equitable remedy") (quoting *Schlup v. Delo*, 513 U.S. 298, 319 (1995)); *Harris v. Nelson*, 394 U.S. 286, 291 (1969) (habeas corpus should "be administered with the initiative and flexibility essential to insure that miscarriages of justices within its reach are surfaced and corrected"). The Court's exercise of its equitable powers should consider the history of violations and the inadequate response of authorities who control every aspect of the detainees' lives.

First, the ICE detainees have been at FDC Sheridan eight weeks without the required religious accommodations. As explained in the declaration by Dr. Simran Jeet Singh, a leading expert on the Sikh faith, while Sikhs practice in many different ways, the basic tenants of the Sikh religion emphasize the wearing of turbans and other sacred religious objects, and the ability to pray at certain times of day in a respectful space. *See* Declaration of Dr. Simran Jeet Singh; *see also Thomas*, 450 U.S. at 714 ("Intrafaith differences . . . are not uncommon among followers of a particular creed, and judicial process is singularly ill equipped to resolve such difference in relation to the Religion Clauses."). Some detainees have been traumatized by being exposed without headwear when, dating back centuries, "forcibly removing a Sikh's turban, or cutting a Sikh's hair has symbolized denying that person the right to belong to the Sikh faith, and has been

considered a humiliating and hurtful physical injury." Singh Declaration at 3. For weeks, no religiously appropriate food was provided to those with dietary religious restrictions. The custodians' failure to make full accommodations for religious practices requires this Court to take direct and compelling action.

Second, to the extent the custodians claim they lack the resources to accommodate religion, no such excuse is permissible under RFRA and RLUIPA. The government cannot create a chaotic situation, then force the detainees to subsidize governmental actions by sacrificing their religious freedoms. The Court should also reject any such claim because, in essence, the governmental agencies may be cutting corners by placing detainees in a federal prison under a contract at the bed rate (or cost per night of custody) of $88.78, the BOP cost per-inmate, per-day, as opposed to the ICE costs of detention, which must consider the language, health, and special costs attributable to immigration detainees, of $133.99. Department of Homeland Security, Immigration and Customs Enforcement, *Budget Overview, Fiscal Year 2019 Congressional Justification*, at 6.

Third, the Court should not accept promises of future action or claims that requests have been met. The initial weeks of detention at FDC Sheridan involved virtually no religious accommodations. Further, the context of these petitions includes the custodians' failure to seriously deal with the pervasive language difficulties in communicating from the beginning of the Oregon detention. As with medical issues, the custodians appear to have made insufficient progress in assuring that individual detainees are instructed in the appropriate language on how to communicate their needs and to seek accommodations with appropriate privacy. Most basically, the FPD has communicated expressly with the custodians regarding the various ways in which the conditions are unconstitutionally punitive, including the range of failing to accommodate religious

beliefs and practices. The Court should require adherence to well-established statutory and constitutionally-based rights.

For the foregoing reasons and those stated in the petitions for habeas corpus and supporting documents, the Court should enter an order requiring the custodians to make the requested religious accommodations forthwith.

Respectfully submitted this 26th day of July, 2018.


_/s/ Lisa Hay_____
Lisa Hay

_/s/ Stephen R. Sady_____
Stephen R. Sady
Attorneys for Petitioner